461 S.E.2d 50

**STATE of West Virginia, Plaintiff
Below, Appellee,**

v.

**Henry Donovan BUZZARD, Defendant
Below, Appellant.**

No. 22531.

Supreme Court of Appeals of
West Virginia.

Submitted May 2, 1995.

Decided July 11, 1995.

Dissenting Opinion of Judge Fox
July 13, 1995.

Virginia Jackson Hopkins, Pros. Atty., for appellee.

Anthony J. Sabatino, Morgantown, for appellant.

WORKMAN, Justice:

This case is before the Court upon the appeal of Henry Donovan Buzzard, from the January 13, 1994, final order of the Circuit Court of Preston County, sentencing the Appellant for his jury convictions of breaking and entering, grand larceny and conspiracy to commit breaking and entering.[1] The Appellant asserts that the trial court committed the following errors when it: 1) refused to grant the Appellant's pre-trial motion to suppress evidence obtained pursuant to the Appellant's unlawful arrest and subsequent unlawful and lawful searches; 2) admitted evidence unlawfully obtained pursuant to the warrantless arrest and subsequent warrantless search and seizure of the Appellant in violation of the Fourth Amendment and article III, section 6 of the West Virginia Constitution when, absent exigent circumstances, law enforcement officers failed to preserve the status quo to make reasonable efforts to obtain warrants; 3) refused to grant the Appellant's pre-trial motion to exclude evidence of the results of the State's latent print and footwear examiner's second test of footprints allegedly belonging to the Appellant when such results and evidence were not timely disclosed to defense counsel contrary to the court-ordered discovery;[2] and 4) refused to grant the Appellant's motion for a new trial. Based upon a review of the record, the parties' briefs and all other matters submitted before the Court, we find that the trial court erred in upholding the warrantless entry into the Appellant's motel room[3] and, accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I.

Around 9:50 p.m. on January 2, 1992, George Pifer, a night watchman at Volkstone Company (hereinafter referred to as "the plant"),[4] an industrial facility located in Preston County, West Virginia, observed a van with a light colored door and one headlight pass in front of the plant. Mr. Pifer also heard a beating or pecking noise coming from the back part of the plant. When he went toward the area to investigate, he observed what appeared to be two shining flashlights. He returned to his office and notified the Preston County Sheriff's Department, as well as one of the plant owners.

---

1. The Appellant was sentenced to a term of not less than one nor more than fifteen years for breaking and entering, with a five year enhancement attached to that sentence for a prior felony conviction of transferring stolen property; to a term of not less than one nor more than ten years to run consecutively with the breaking and entering sentence for grand larceny; and to a term of one to five years for conspiracy to commit breaking and entering.

2. Based on our holding, we decline to address the Appellant's alleged error concerning the admissibility of Sergeant Neal's testimony with regard to his analysis of the Appellant's shoe sole design in relation to the second set of photographs taken at the crime scene.

3. Because we conclude that the warrantless entry of the Appellant's motel room was unlawful, the Appellant's subsequent warrantless arrest was unlawful as well since the probable cause for said arrest was predicated upon the shoe design of the Appellant's shoes seized pursuant to the officers' unlawful entry. Accordingly, we find the Appellee's contention that the Appellant was subjected to a lawful warrantless arrest to be without merit.

4. The facility was no longer in operation, but previously had been used as a manganese processing plant known as Chemetals.

James D. Fields, Sheriff of Preston County, responded to Mr. Pifer's telephone call. Upon his arrival at the plant, Sheriff Fields noticed a van parked alongside the roadway. Two men were seated in the front seats of the van. They were identified as Teddy Lee Workman and Tommy Mitchell White, both from Boone County, West Virginia. Directly beside the van, leaning against a concrete abutment, was a industrial-size circuit breaker box affixed with a Chemetals identifying tag.

The sheriff entered one of the plant buildings which Mr. Pifer identified as the one he had observed several individuals enter. The sheriff first observed an open door and a dangling chain. He also heard individuals running and observed three separate designs of shoe prints in the dust-covered floor, as well as other foot prints, which were created when individuals had traveled through a damp area near the entrance of the building. The sheriff was unable to locate anyone in the building. Sheriff Fields also testified that he found numerous cigarette butts near the van and near the area in the plant where the circuit breakers where located. Additionally, in one of the rooms of the building, the sheriff observed a circuit breaker box partially disconnected from the wall and another circuit breaker box completely disconnected from the wall sitting on the floor.

Teddy Workman and Tommy White were placed under arrest at the scene. The sheriff ascertained that the van in which the two men were found was registered to Mr. James Buzzard, also from Boone County. Sheriff Fields testified that he continued searching the area around the plant for additional suspects. As part of this continuing investigation, the sheriff checked the Heldreth Motel, the only motel in Kingwood, West Virginia, to determine if any guests had checked in recently. Sheriff Field was told by the desk clerk that a Mr. Henry Buzzard had checked into the motel at approximately 1:03 a.m. and was in room 210. According to the sheriff's testimony, when the Appellant checked in, he told the night clerk that the sheriff had sent him to the motel. The sheriff knew that this was untrue.

At approximately 2:20 a.m., the sheriff, Deputy Bob Bailor[5] and Trooper Rick Brown went to room 210 and knocked on the door. The Appellant opened the door and the officers entered the room which was occupied by not only the Appellant but also by Danny Ray Griffy.[6] No written consent to search was obtained by the sheriff. When the sheriff told the Appellant what he was investigating, and that it involved Mr. White and Mr. Workman, the Appellant informed the sheriff that they had been with those two men earlier in the evening, but that Mr. White and Mr. Workman had dropped the Appellant and Mr. Griffy off and had not come back for them. Additionally, the sheriff noticed that there were shoes on the floor with the soles visible. The sheriff testified that the tread design of the shoes was similar to the tread designs he saw on the floor at the plant site. The sheriff seized the shoes[7] and transported the Appellant and Mr. Griffy

5. Deputy Bailor's last name is also spelled Baylor in portions of the record. For consistency, we use the spelling as it appears *supra* in the text.

6. The officers did not obtain either an arrest or search warrant prior to entering the room; however, the trial court found that the Appellant consented to the officer's entry. It is this ruling that forms the basis of the present appeal and it is discussed in greater detail in section II of this opinion *infra*.

7. The Appellant's and Mr. Griffy's shoes were the only items seized from the motel room at this time. A second search of the motel room was executed pursuant to a search warrant. During this second search, a Heldreth Motel business card with directions to Kingwood, West Virginia, where the motel and the plant were located, written on it, some cigarette filters, a motel phone record showing a phone call originating from the Appellant's room to a Boone County telephone number, and a beer bottle were seized. Joseph Stiles of the Preston County Sheriff's Department, who executed the search warrant, testified that he believed that either the Appellant or Mr. Griffy called someone in Boone County to ask the person to drive to Kingwood to pick up the Appellant and Mr. Griffy. Further, while no finger prints were obtained from the beer bottle, the bottle was the same brand as beer bottles found in the van at the crime scene. Finally, the cigarette filters were similar to cigarette filters found at the crime scene, and the filters contained genetic markers consistent with the genetic markers of Mr. Griffy, Mr. Workman, as well as the Appellant.

to the sheriff's department where they were placed under arrest.

Additional evidence introduced by the State included the testimony of John Richard Giacalone, a chemist with the West Virginia State Police, who offered testimony regarding the presence of trace amounts of manganese, which his testing found on Tommy White's tennis shoes and jackets [8] belonging to Mr. Griffy and the Appellant. Also, William Tobin, a forensic metallurgist with the Federal Bureau of Investigation in Washington, D.C., testified that he found a high concentration of manganese on the Appellant's gloves, as well as Mr. Griffy's gloves. Further, Sergeant Mark Neal of the West Virginia State Police Criminal Identification Bureau testified that footwear impressions contained in a set of photographs taken at the crime scene were consistent with the Appellant's shoe sole design.

The Appellant did not testify. The only witness for the defense was John Penn, an associate professor in the Department of Chemistry at West Virginia University. Mr. Penn's testimony essentially indicated that the manganese found on the Appellant's gloves and clothing could have originated from sources other than the plant, such as a mine or a car.

## II.

▇ The only issue before the Court is whether the trial court erred in failing to suppress evidence obtained pursuant to the warrantless entry of the Appellant's motel room. A suppression hearing was conducted to ascertain whether the evidence obtained as a result of the officers' warrantless entry into the hotel room should be suppressed. First, the circuit court, without a timely objection from the Appellant, agreed to the

prosecutor's request to make the transcript of the joint suppression hearing which occurred on April 9, 1994, in the State's case against the Appellant's co-defendants, Mr. Workman, Mr. White and Mr. Griffy, a part of the record in the Appellant's case.[9] In the April 9, 1994, hearing, Sheriff Fields' testimony concerning the issue of the Appellant's consent was that the sheriff, accompanied by two other officers, went to the motel room and the sheriff knocked on the door. Sheriff Fields testified that the knock was

> answered from inside by someone. I'm not sure which of the two answered. Asked who it was. I told them it was the Sheriff. I asked them to open the door. And within a matter of seconds they opened the door. I walked in along with Deputy Baylor I think and Corporal Brown. Mr. Griffy was in bed. Mr. Buzzard was up. He had let us in."

Further, according to the transcript of the Appellant's suppression hearing on August 2, 1993, Sheriff Fields testified that "Mr. Buzzard answered the door and we went in." The Appellant, however, testified, at the suppression hearing, that when he answered the door, "[t]hey forced theirself [sic] in on me." The Appellant further stated that at the time this occurred he did not know who "they" were. The circuit court found that "[h]e [the sheriff] went to the room, knocked, identified himself and one (1) of the persons, it appears that Mr. Buzzard was in fact that person, let him in." At trial, Sheriff Fields' testimony indicated that "[h]e [the Appellant] opened the door and at that point in time I entered the room. He asked me to come in."

▇ The Appellant maintains that the police entered his motel room without a warrant and without his consent. The Appellant

---

8. The sheriff seized the jackets upon the Appellant's and Mr. Griffy's arrest.

9. It is important to note at the outset that the record clearly indicates that the Appellant neither objected to the trial court giving consideration to the earlier proceeding, at which the same judge presided, nor expressed a desire to cross-examine the witnesses who testified in the prior proceeding. Further, the sheriff, who the State relied upon in its attempt to establish that the Appellant voluntarily consented to the offi-

cers' entry of the room, also testified at the Appellant's suppression hearing. A circuit court has the inherent power to administer its docket so as to conserve scarce judicial resources. Thus, absent a timely objection, a circuit court has ample discretion in deferring to another circuit court proceeding involving the co-defendants and identical issues to avoid duplicative litigation. *See generally Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183–84, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952).

also argues that even though the officers may have been able to seize the Appellant's shoes under the plain view doctrine, this could have only been accomplished if the entry itself into the Appellant's motel room was lawful, and the Appellant maintains that it was not. In contrast, the Appellee argues that the Appellant consented to the officers' entry into the motel room. Further, the Appellee contends that the shoes were lawfully seized under any of the following three exceptions to the warrant requirement: 1) the seizure of the shoes was incident to a lawful arrest;[10] 2) the shoes were in plain view; and 3) the shoes were seized under exigent circumstances.[11]

■ The Fourth Amendment, as well as article III, section 6 of the West Virginia Constitution, protects individuals in their homes against unreasonable search and seizure. As a general rule, warrantless searches of a person's home are forbidden. *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *State v. Peacher*, 167 W.Va. 540, 562, 280 S.E.2d 559, 574–75 (1981). A motel room occupied as a temporary residence is entitled to the same constitutional protection. *United States v. Jeffers*, 342 U.S. 48, 51–52, 72 S.Ct. 93, 95–96, 96 L.Ed. 59 (1951); *United States v. Burns*, 37 F.3d 276, 278–79 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2592, 132 L.Ed.2d 840 (1995). Thus, a warrantless entry into or search of a motel room is " *'per se* unreasonable ... subject only to a few well-delineated exceptions.' " *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)); *accord State v. Tadder*, 173 W.Va. 187, 190, 313 S.E.2d 667, 670 (1984). One such exception is that a warrantless entry and search are permissible if the authorities have obtained the voluntary consent of a person authorized to grant such consent.

■ It is axiomatic that the same general principles governing consent to search private premises are applicable to consent to enter the premises as well. Accordingly, in syllabus point eight of *State v. Plantz*, 155 W.Va. 24, 180 S.E.2d 614 (1971), *overruled in part on other grounds by State ex rel. White v. Mohn*, 168 W.Va. 211, 283 S.E.2d 914

---

**10.** The State contends that the seizure of the shoes was justified as incidental of a lawful arrest. Although we refuse to hold that a formal arrest must always precede the actual search and seizure, our cases are clear that there must be, independently of the evidence seized, *probable cause to arrest* before a lawful seizure under this exception can occur. *See Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *State v. Farley*, 167 W.Va. 620, 623–24, 280 S.E.2d 234, 236 (1981). The fruits of the search cannot justify the arrest. *State v. Moore*, 165 W.Va. 837, 855–56, 272 S.E.2d 804, 815–16 (1980), *overruled on other grounds by State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991); *State v. Thomas*, 157 W.Va. 640, 651–53, 203 S.E.2d 445, 453–54 (1974). In this case there was no justification for the arrest until after the search. Furthermore, we hold *infra* that the entry into the motel was illegal and, therefore, any evidence seized while the police were present is "fruit of the poisonous tree."

**11.** One of the recognized exceptions to the warrant requirement is where exigent circumstances exist at the time of the entry or search. *Mincey v. Arizona*, 437 U.S. 385, 392–93, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978). Exigent circumstances exist where there is a compelling need for the official action and there is insufficient time to secure a warrant, police may then enter and search private premises, in this case a motel, without obtaining a warrant. *See Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949–50, 56 L.Ed.2d 486 (1978). Exigent circumstances may exist in many situations: three well recognized situations are when police reasonably believe (1) their safety or the safety of others may be threatened, (2) quick action is necessary to prevent the destruction of potential evidence, or (3) immediate action is necessary to prevent the suspect from fleeing. *See State v. Mullins*, 177 W.Va. 531, 355 S.E.2d 24 (1987). The "exigent circumstances" exception has not been shown to be applicable to this case. Sheriff Fields' testimony at the suppression hearing indicated that he did not have any reason to believe that the Appellant was destroying evidence at the motel prior to his arrival. The sheriff also testified that he had no evidence that the suspects at the motel might be dangerous to others. Moreover, the sheriff's testimony concerning whether he believed the Appellant might flee the scene was that "[i]f the individuals in that [motel] room had knowledge of what happened at Kim Metals [sic] ... I felt that they would have fled the scene...." Finally, the sheriff's testimony revealed that his concern that some evidence might be destroyed if the suspects in the room were to leave only arose *after* his entry into the motel room.

(1981), we recognized that a search which is voluntarily consented to is not unreasonable and, therefore, does not violate the Fourth Amendment, stating that

> [t]he general rule is that the voluntary consent of a person who owns or controls premises [12] to a search of such premises is sufficient to authorize such search without a search warrant, and that a search of such premises, without a warrant, when consented to, does not violate the constitutional prohibition against unreasonable searches and seizures.

155 W.Va. at 25, 180 S.E.2d at 616 (footnote added); *see* Syl.Pt. 3, *State v. Justice,* 191 W.Va. 261, 445 S.E.2d 202 (1994).

 The State has the burden of proving by a preponderance of the evidence that the consent to search was given voluntarily. *State v. Worley,* 179 W.Va. 403, 410, 369 S.E.2d 706, 713, *cert. denied,* 488 U.S. 895, 109 S.Ct. 236, 102 L.Ed.2d 226 (1988) (citing *State v. Hacker,* 158 W.Va. 182, 209 S.E.2d 569 (1974)). " 'Whether a consent to a search is in fact voluntary or is the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.' Syllabus Point 8, *State v. Craft,* 165 W.Va. 741, 272 S.E.2d 46 (1980)." Syl.Pt. 4, *Worley,* 179 W.Va. at 406, 369 S.E.2d at 709. However, in making a factual assessment concerning the existence of voluntary consent, the inquiry focuses upon whether the facts available to the officer at the moment of entry ' " 'warrant a man of reasonable caution in the belief' " ' that the party had voluntarily authorized the officer's entry onto the premises. *Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990) (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968)). Finally, we review a trial court's legal conclusions regarding suppression determinations de novo, and the factual determinations involving those legal conclusions are reviewed under the clearly erroneous standard. *State v. Honaker,* 193 W.Va. 51, 56, 454 S.E.2d 96, 101 (1994) (citing *State v. Farley,* 192 W.Va. 247, 452 S.E.2d 50 (1994) and *State v. Stuart,* 192 W.Va. 428, 452 S.E.2d 886 (1994)).

 At the crux of this issue is whether the Appellant consented to the officers entering his motel room, or merely acquiesced to their entry in the face of authority.[13] In delving into this issue, it is helpful to identify relevant factors that this Court has previously utilized in evaluating the voluntariness of consent.[14] For example, in *State v. Mullins,* 177 W.Va. 531, 355 S.E.2d 24 (1987), relying in part upon the custodial status of the individual in ascertaining whether he had given voluntary consent,[15] we found that an individual in custody as a result of an illegal arrest was "in no position to resist an officer's request to allow his home to be searched." *Id.* at 532, 355 S.E.2d at 25, Syl.Pt. 7, in part. Further, in order to be voluntary, the consent given cannot be the product of duress by law enforcement or "inherently coercive tactics—either from the nature of the police questioning [in obtaining consent] or the environment in which it [the

---

12. Similarly, a person who has joint control over the premises may give a valid consent to search, as long as the facts establish that the person had "the requisite authority over or relationship to the premises to be searched to justify his allowing the police to conduct a search." Syl.Pt. 3, in part, *State v. Hambrick,* 177 W.Va. 26, 350 S.E.2d 537 (1986); *see also United States v. Matlock,* 415 U.S. 164, 169–72, 94 S.Ct. 988, 992–94, 39 L.Ed.2d 242 (1974) (stating that consent may validly be given by third person who possesses common authority over premises).

13. Verbal consent must be "more than 'mere submission to authority.' " *State v. Fellers,* 165 W.Va. 253, 257, 267 S.E.2d 738, 741 (1980) (quoting, in part, *Thomas,* 157 W.Va. at 652, 203 S.E.2d at 454). Where an individual merely mouths words of acquiescence because, under the circumstances, submitting to authority is the *only* alternative, an individual's rights are not waived and a Fourth Amendment claim is not foreclosed.

14. *See* 1 Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure* I–289–90 (2d ed. 1993) (discussing relevant factors to be considered in evaluating voluntariness of consent).

15. While the custodial status of an individual giving consent is a factor to be considered when determining whether consent is voluntarily given, there is no concomitant implication that a person lawfully detained or in the custody of police can never give voluntary consent to search. *See State v. Williams,* 162 W.Va. 309, 316, 249 S.E.2d 758, 763 n. 4 (1978).

consent] took place." *Schneckloth*, 412 U.S. at 247, 93 S.Ct. at 2058; *see Worley*, 179 W.Va. at 410, 369 S.E.2d at 713. Consideration has also been given to the defendant's awareness of his right to refuse consent as was the case in *State v. Basham*, 159 W.Va. 404, 223 S.E.2d 53 (1976), where we held:

> It is not necessary, as a prerequisite to obtaining a voluntary consent to a noncustodial search, that law enforcement officers give *Miranda*[16] warnings or similar warnings relating to Fourth Amendment rights, although the subject's knowledge of a right to refuse is a relevant factor in determining whether the consent was voluntary and knowledgeable.

*Id.* at 404–05, 223 S.E.2d at 54, Syl.Pt. 2 (footnote added); *accord Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59. Additionally, the defendant's education and intelligence are factors this Court has used in ascertaining whether consent was voluntarily given. *See Schneckloth*, 412 U.S. at 248, 93 S.Ct. at 2058–59 (stating that voluntariness takes into account evidence of minimal schooling and low intelligence); *State v. Williams*, 162 W.Va. 309, 316, 249 S.E.2d 758, 763 (1978) ("The intelligence of a person allegedly consenting to a search is a factor to be considered in determining the voluntariness of a consent search."). In *Williams*, we also considered whether consent was given at a time when the defendant believed that no incriminating evidence would be found in evaluating the voluntariness of consent. *Id.* at 317, 249 S.E.2d at 763. ("[T]he conclusion that the consent was not the product of free will is reinforced by the fact that the alleged consent to search was given at a time when the defendant still denied any involvement in the crime under investigation."). Finally, in determining voluntariness of consent, we have given consideration to the extent and level of the defendant's cooperation with the police. *See generally Justice*, 191 W.Va. at 268, 445 S.E.2d at 209 (finding that evidence established defendant's consent to search of car).

Accordingly, rather than sporadically referring to the above-mentioned factors in making determinations of whether consent has been voluntarily obtained, the circuit court, and this Court on review, should consider the following six criteria when evaluating the voluntariness of a defendant's consent: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel. While each of these criteria is generally relevant in analyzing whether consent is given voluntarily, no one factor is dispositive or controlling in determining the voluntariness of consent since such determinations continue to be based on the totality of the circumstances.[17] *See Worley*, 179 W.Va. at 406, 369 S.E.2d at 709.

■ Unfortunately, in the present case, the circuit court failed to discuss its consideration of any of these factors or to articulate any of the underlying facts upon which it relied to find a consensual entry. Further, a review of the record of the suppression hearings in this case establishes that Sheriff Fields, accompanied by two other officers, went to the Appellant's motel room at 2:20 a.m. The sheriff knocked on the motel room and the Appellant "opened" or "answered" the door, after which the officers went into the room. The record is devoid of any evidence presented by the State which indicates

16. *See* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

17. It is important to note that the above-mentioned criteria apply to the evaluation of both a defendant's consent to enter, as well as a defendant's consent to search. However, we are not suggesting that once a defendant gives consent to enter, police officers have carte blanche consent to search the premises as well. The scope of the consent is determined by a standard of objective reasonableness. *See Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). Under the objective reasonableness standard, if the police only obtain a consent to enter, then the officers would be able to seize evidence or contraband which was in plain view. However, if the officers wish to proceed further and search the premises using the consent exception to the warrant requirement, they first must obtain a separate consent to search from the defendant.

that the officers asked the Appellant if they could enter the motel room, or that the Appellant in any manner voluntarily told the officers that they had his permission to enter the room.

 The State's only evidence which tended to support that the Appellant consented to the entry is found in Sheriff Fields' testimony at trial where he stated that the Appellant "opened the door and at that point in time I entered the room. *He [the Appellant] asked me to come in.*" (Emphasis added). Had the State brought to the trial court's attention during the suppression hearing that the Appellant had invited the officers to enter the room, and had the trial court determined that the Appellant's invitation was made voluntarily under the circumstances, then the trial court would have had evidence to support a finding that the Appellant indeed rendered a voluntary consent to enter. However, there is no authority to support the State's position that upon appellate review, we should consider the sheriff's testimony at trial in upholding the trial court's ruling which arose out of the pre-trial suppression hearing. While it is clear that "[a] trial court has the authority to reconsider and set aside its prior order granting a defendant's motion to suppress a confession when presented with new or additional evidence that would have a substantial effect on the court's ruling[,]" the problem in this case is that the State obtained a favorable ruling with regard to the suppression hearing and, therefore, failed to recognize that even with

the favorable ruling, in reality, the burden of proof on the consent issue had not been met. Syllabus, *Thompson v. Steptoe,* 179 W.Va. 199, 366 S.E.2d 647 (1988). It certainly was within the realm of possibilities for the State to have recognized this flaw during trial and requested the trial court to reopen the pre-trial suppression hearing in order to consider more testimony concerning the consent issue. *See id.* at 201, 366 S.E.2d at 649 n. 2 (stating that "ability to reconsider suppression rulings has not been confined to cases in which reopening would operate in the defendant's favor"). However, absent a motion by the State which would trigger the trial court's duty to revisit its decision on the suppression issue, the State, on appeal, can not use trial testimony to correct an erroneous pre-trial ruling.

Consequently, considering the totality of the circumstances presented to the lower court, we conclude that since the State failed to present sufficient evidence to support a finding on whether the Appellant consented to the officers' entry, the trial court's finding that the Appellant voluntarily consented to enter was clearly erroneous. *See Honaker,* 193 W.Va. at 56, 454 S.E.2d at 101. Having concluded that the Appellant did not voluntarily consent to the search, we also conclude that the trial court erred in admitting the Appellant's shoes in evidence.[18] Further, all other evidence which was derivatively received as a result of the illegal entry [19] is also inadmissible,[20] since that evidence falls within

**18.** The only way that evidence could have been properly seized under the facts of this case was pursuant to the plain view exception to the warrant requirement and the State cannot establish the first requirement of plain view which is that "the officer did not violate the Fourth Amendment in arriving at the place from which the incriminating evidence could be viewed[.]" Syl. Pt. 3, in part, *Julius,* 185 W.Va. at 424, 408 S.E.2d at 3.

**19.** According to the testimony of Deputy Stiles, he obtained the search warrant to conduct the second search of the Appellant's motel room based upon the following information: 1) the Appellant's arrest; 2) the officers locating the Appellant in a room at the Heldreth Motel; and 3) the shoe sole designs left at the plant by the perpetrators were consistent with the shoe sole designs of the Appellant's and Mr. Griffy's shoes seized from motel room. Since the second

search warrant was obtained on probable cause emanating from the officers' illegal entry of the Appellant's motel room, the evidence obtained as a result of the second search has its origins in the officers' illegal entry and, therefore, would be inadmissible unless the Appellee can demonstrate one of the exceptions to the exclusionary rule found in note 20 *infra.* The excluded evidence would include not only the clothing obtained from the Appellant subsequent to his arrest, but also the evidence seized as a result of the second search of the Appellant's motel room.

**20.** Evidence obtained as a result of the illegal police conduct may still be admissible if the State can demonstrate that the evidence was not a product of the "exploitation of the illegality." 1 Cleckley, *supra* note 14, at I–210. We have previously held:

There are three generally recognized exceptions to the exclusionary rule: (1) where evi-

the purview of the "fruit of the poisonous tree" doctrine. *See generally State v. Goodmon,* 170 W.Va. 123, 131, 290 S.E.2d 260, 268 (1981); 1 Cleckley, *supra* note 14, at I–208–10.

Based on the foregoing, the decision of the Circuit Court of Preston County is hereby reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.

BROTHERTON and RECHT, JJ., did not participate.

MILLER, retired J., and FOX, Judge, sitting by temporary assignment.

FOX, Judge dissents, and reserves the right to file a dissenting Opinion.

FOX, Judge, dissenting: [1]

(Filed July 13, 1995)

I respectfully dissent to the majority opinion, not because it incorrectly states the law, for it does not. Indeed, it provides significant guidance to both the bench and bar as to the proper application of the criminal law relating to consent.

Rather, I dissent because, having properly stated and substantially clarified the law of consent, the majority then proceeds to substitute its judgment for that of the trial court on a purely factual determination, i.e., whether the entry of the law enforcement officers into the defendant's motel room was consensual.

Without question, the evidence of the defendant's "voluntary consent" to the entry of his room was sparse. Sheriff Fields testified that the defendant, responding to the Sheriff's knock, "... let us in." The defendant, on the other hand, said "[t]hey forced theirself [sic] in on me."

As set forth in the majority opinion, the issue of "... whether a consent is in fact voluntary or is the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." As a result of the companion cases of co-defendants, there were several *in camera* suppression hearings which dealt with the consent issue in this case, during which the trial court heard and observed the individual witnesses and, presumably, formed an opinion as to the accuracy and truthfulness of their testimony. Appellate courts have no equal basis for judging the witnesses' testimony, inasmuch as they have only the transcribed, "cold" record at their disposal. These suppression hearings also afforded the trial court the opportunity to assess the totality of the circumstances, again, an opportunity not so easily assumed by appellate courts.

The majority points out that the circuit court failed to discuss its consideration of the criteria set forth in syllabus point 3 of the majority opinion, and, indeed, no such discussion was undertaken on the part of the judge. However, this does not mean that the various relevant criteria were not, in fact, considered. And I am somewhat concerned by the ever-increasing requirement placed upon trial courts, by appellate courts, to elucidate upon their rulings on factual questions. Such a requirement is particularly burdensome since trial courts, in addition to facing ever-increasing dockets, must also consider factors such as speedy-trial rights, time standards, and the economical and efficient use of juries. But realizing that, absent such elucidation as to fact-finding, it is many times difficult for a reviewing appellate court to determine if the trial court's ruling on a question of fact was appropriate under the evidence, I begrudgingly accept this crescive responsibility.

dence sought to be introduced has an independent source, (2) where the evidence would inevitably have been discovered, and (3) where the connection between unconstitutional police conduct and the discovery of the evidence is so attenuated as to remove any taint of the original illegality. Syl.Pt. 2, *State v. Hawkins,* 167 W.Va. 473, 280 S.E.2d 222 (1981), *cert. denied,* 455 U.S. 925, 102 S.Ct. 1287, 71 L.Ed.2d 468 (1982).

1. Pursuant to an administrative order entered by this Court on 18 November 1994, the Honorable Fred L. Fox, II, Judge of the Sixteenth Judicial Circuit, was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing 1 January 1995 and continuing through 31 March 1995, because of the physical incapacity of Justice W.T. Brotherton, Jr. On 14 February 1995 a subsequent administrative order extended this assignment until further order of said Court.

However, in the instant case, the question of fact was a fairly simply one, and its resolution depended almost entirely on "who you believe." The trial court heard the witnesses and found more credible the State's evidence that the officers had been "let … in," as opposed to the defendant's evidence that "they forced theirself (sic) in on me." The failure to individualize each of the six criteria in syllabus point 3 should not be fatal to the trial court's factual determination. He heard the witnesses, he assessed their credibility, he determined what was the totality of the circumstances, and he found the defendant had voluntarily consented to the Sheriff's entry.

On the whole record, I am not disposed to conclude, as does the majority, that the State "failed to present sufficient evidence to support a finding on whether the Appellant consented to the officers' entry." I am even less disposed to hold that the trial court's finding of fact on this issue was "clearly wrong." I need not point out that there is a substantial difference between questioning the basis for the ruling of a trial court and finding that it was clearly wrong.

Bottom line: in the instant case, it was the trial court's call, properly made. I would, therefore, validate the seizures and sustain the convictions.